**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

NGOZI IWEHA,

    Plaintiff - Appellant,

v.

STATE OF KANSAS; KANSAS
DEPARTMENT OF AGING AND
DISABILITY SERVICES; MARY
SEDDEN, JOHN FOX, LESLIER
DIPMAN

    Defendants - Appellees.

No. 23-3074

———————————————————

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:21-CV-01228-DDC)**

———————————————————

Andrew L. Foulston (Jennifer M. Hill and Matthew A. Gorney with him on the briefs),
McDonald Tinker PA, Wichita, Kansas, for Plaintiff-Appellant.

Jeffrey M. Kuhlman (Allen G. Glendenning with him on the brief), Watkin Calcara,
Great Bend, Kansas, for Defendants-Appellees.

———————————————————

Before **HOLMES**, Chief Judge, **BALDOCK**, and **MATHESON**, Circuit Judges.

———————————————————

**HOLMES**, Chief Judge.

———————————————————

    Ngozi Iweha appeals from an adverse summary judgment entered in favor of

her former employer on her claims of hostile work environment, disparate treatment, and retaliation in violation of Title VII.  After summarizing the relevant facts in Ms. Iweha's case, we examine each of her three claims on appeal.  Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment.

## I

In order to provide the necessary factual background for our legal analysis, we describe the conditions of Ms. Iweha's work environment, including various incidents involving Ms. Iweha and her coworkers that culminated in a confrontation on June 10, 2020.

## A

Ms. Iweha is a Black woman who was born and educated in Nigeria.  She emigrated to the United States in 1995.  In September 2017, Ms. Iweha was hired as a staff pharmacist at Larned State Hospital ("LSH"), which is operated by the Kansas Department for Aging and Disability Services ("KDADS").  In May 2018, Mary Seddon became pharmacist-in-charge at LSH and Ms. Iweha's immediate supervisor.  Ms. Seddon also supervised two other staff pharmacists—John Fox and Janet Finger—as well as several pharmacy technicians.  During the relevant period, Ms. Iweha was the only Black employee at the pharmacy.

At LSH, one of the pharmacists' primary responsibilities was to fill prescriptions that providers submitted.  Pharmacists took turns logging in to the patient portal to verify and fill prescription orders because only one pharmacist could access the portal at a given time.  The pharmacists referred to the list of unfilled

2

orders as the "queue."

The staff pharmacists worked overlapping, but not identical, shifts. Mr. Fox worked from 7:00 a.m. to 3:30 p.m., Ms. Finger worked from 7:30 a.m. to 4:00 p.m., and both Ms. Iweha and Ms. Seddon worked from 8:00 a.m. to 4:30 p.m. The pharmacy's hours of operation were 8:00 a.m. to 4:30 p.m.

**1**

According to Ms. Iweha, she was excluded from meetings at the pharmacy and discussions between her coworkers. In one example, she overheard her coworkers discussing a project involving a University of Kansas consultant. When she asked if she could help, she was sent a "random document" to distract her from the project. Jt. App., Vol. III, at 138–39, Tr. 52:4–53:2 (Iweha Dep., July 19, 2022). She was later brought into a project with the consultant.

Ms. Iweha also recounted several comments and questions by her coworkers—which we describe as Ms. Iweha alleged them—and argues they created a hostile work environment. Mr. Fox asked Ms. Iweha where she went to school, and when she replied that she had obtained her degree from a pharmacy school in Nigeria, he asked Ms. Iweha if there were pharmacy schools in Nigeria. Mr. Fox once asked a pharmacy technician rather than Ms. Iweha to watch the queue when he left the office, even though the technician could not verify the prescriptions and Ms. Iweha was present. Mr. Fox also asked Ms. Iweha if Nigeria had a currency or cars. Ms. Seddon asked Ms. Iweha where she learned to speak English. Ms. Finger asked Ms. Iweha if she "ever washed [her] hair." *Id*. at 129, Tr. 43:19–23. Ms. Seddon also

3

made a disparaging remark about Nigerian women: "Nigerian women do not go to school. The few who do get educated are bossy." *Id*. at 109, Tr. 23:15–20. One January, Ms. Seddon began to give Ms. Iweha an assignment for the upcoming Monday, and when Ms. Iweha pointed out that it was the Martin Luther King, Jr. holiday, Ms. Seddon "looked at [Ms. Iweha] in disgust" and said, "Is that a holiday?" *Id*. at 160, Tr. 74:3–19.

In one particularly noteworthy incident, Ms. Iweha attests that Mr. Fox brought into the pharmacy a set of beads that he believed were used in the slave trade. Mr. Fox showed the beads to Ms. Iweha. He told her that they were "slave trade beads," *id*. at 118, Tr. 32:14–18, and that they reflected her "heritage," *id*. at 116, Tr. 39:4–8. Ms. Iweha was "very upset" by this incident; she told Mr. Fox that his behavior was "not appropriate," but Mr. Fox "blew it off." *Id*. at 119, Tr. 33:1–19.

Ms. Iweha maintains that she "constantly went to [Ms. Seddon] to talk with her about the way [she] was being treated in the pharmacy." *Id*. at 153, Tr. 67:23–25. With one exception, these were oral conversations in Ms. Seddon's office. In general, Ms. Iweha could not recall the specific content of her conversations with Ms. Seddon or, notably, whether she informed Ms. Seddon that she felt she was experiencing race- or national origin-based discrimination or harassment. However, Ms. Iweha maintains that she "made it known that [she] was being discriminated against." *Id*. at 154, Tr. 68:8–12. In this regard, she recalls specifically telling Ms. Seddon about Mr. Fox asking a pharmacy technician to watch the queue while he was

4

out, rather than Ms. Iweha, and that she "found that discriminatory." *Id*. at 128, Tr. 42:3–19.

Additionally, although Ms. Iweha herself could not recall doing so, Ms. Seddon testified that she had a conversation with Ms. Iweha about the "slave trade beads" incident, and Ms. Seddon told Mr. Fox to "stop it" because Ms. Iweha was offended. Jt. App., Vol. IV, at 86, Tr. 74:5–25 (Seddon Dep., Sept. 29, 2022). Further, on one occasion, Ms. Iweha did document a complaint to Ms. Seddon: she sent Ms. Seddon an email "telling her that [Ms. Iweha] was excluded from discussions" at work and that she "just want[ed] to be part of the team." Jt. App., Vol. III, at 136, Tr. 50:2–14. Ms. Iweha never contacted the LSH Human Resources Department with any complaints or concerns.

## 2

On March 25, 2020, Mr. Fox and Lynette Lewis, a pharmacy technician, met with Susanne Prescott, an employee relations manager in LSH's Human Resources Department, to "complain" about Ms. Iweha. Jt. App., Vol. II, ¶ 2, at 63 (Prescott Aff., Oct. 13, 2022). At this meeting, "Mr. Fox presented a laundry list of complaints about Ms. Iweha, including her conduct in the lab, her unwillingness to be a team player and work with others, and her creation of a hostile work environment." *Id*. ¶ 3, at 63. He specifically reported that Ms. Iweha used office resources for personal reasons, made "excessive personal phone calls" during the day, and slept in the back room of the pharmacy during work hours. *Id*. at 66–67 (Prescott Aff., Attach. 1, Mar. 25, 2020).

Ms. Prescott then spoke with Ms. Seddon, who "had observed similar behavior, but had not formally or thoroughly addressed those issues." *Id*. ¶ 6, at 63. Ms. Prescott and Ms. Seddon "developed a plan to establish clearer expectations in the pharmacy so that employment issues could be better addressed in the future." *Id*. ¶ 8, at 64. As part of this plan, Ms. Prescott "advised Ms. Seddon that when other pharmacy employees complained [about Ms. Iweha's behavior], Ms. Seddon should encourage those coworkers to document the dates, times, and what they had observed." *Id*. ¶ 9, at 64. Mr. Fox began taking "notes of issues with Ms. Iweha, such as her coming to work late or surfing the internet." Jt. App., Vol. II, ¶ 10, at 61 (Fox Aff., Oct. 13, 2022). Ms. Iweha felt that Ms. Finger and Ms. Seddon were "watching [her] every move," and she later learned that Mr. Fox and Ms. Finger had been "keeping logs" of her activities. Jt. App., Vol. III, at 146, Tr. 60:2–18.

In May and June 2020, Ms. Seddon met with Mr. Fox, Ms. Finger, and Ms. Iweha to discuss a new Performance Review Form ("PRF") that Ms. Seddon was implementing at the LSH pharmacy. One of the components that would factor into the PRF was the number of prescriptions filled by each pharmacist. Ms. Iweha agreed that the new PRF's criteria were "reasonable"—including the number of prescriptions filled—but she "raise[d] a concern about the pharmacists who came in early getting an unfair advantage" in the system because they had a long queue of overnight prescription orders available to fill. Jt. App., Vol. I, ¶ 13, at 197 (Seddon Aff., Oct. 13, 2022).

Before the implementation of the PRF system, Ms. Seddon had offered to

6

allow Ms. Iweha to arrive early and leave early like Mr. Fox did, but Ms. Iweha declined the offer. To address Ms. Iweha's concern about the buildup of overnight orders for the morning shift, however, Ms. Seddon "directed Mr. Fox to leave a portion of overnight orders unfilled so that Ms. Iweha could fill them when she came in at 8:00 a.m." *Id*. ¶ 13, at 197. Although Mr. Fox complied with the request, he reported that "[o]ften, those prescriptions would remain unverified long after Ms. Iweha arrived at work and Ms. Finger or [he] would end up verifying them anyway." Jt. App., Vol. II, ¶ 15, at 61. Over the first five months of 2020, Ms. Iweha verified 3,514 prescriptions—far fewer than Mr. Fox, who verified 18,925, and Ms. Finger, who verified 9,874. Even as a supervisor, Ms. Seddon verified more prescriptions than Ms. Iweha: 5,395. The three staff pharmacists spent roughly seventy percent of their time verifying prescriptions, while Ms. Seddon, as supervisor, spent forty percent of her time verifying prescriptions.

On June 3, 2020, Kansas Governor Laura Kelly sent a letter to all state employees in response to the deaths of George Floyd, Breonna Taylor, and Ahmaud Arbery. In the letter, Governor Kelly acknowledged "issues of racial inequality and intolerance in Kansas or in our workplaces" and "committed to taking action against racial inequality." Jt. App., Vol. VI, at 149 (Letter from Gov. Kelly to State of Kan. Emps., dated June 3, 2020). Ms. Iweha "found the letter reassuring" so she copied it and displayed it at her workstation. Jt. App., Vol. III, at 203, Tr. 117:6–13. Ms. Iweha later learned the letter made some of her coworkers "uncomfortable" and they "found it inappropriate." *Id*. at 203, Tr. 117:6–13.

**3**

On June 10, 2020, while Ms. Seddon was on vacation, Ms. Iweha emailed Ms. Seddon, Mr. Fox, and Ms. Finger asking, for the first time, if she could start coming in early to have equal access to the overnight prescription orders. Ms. Seddon replied later that morning that everyone should maintain their current schedules while she was on vacation but that she would hold a "team meeting" after she returned "to discuss and rearrange the work schedule." Jt. App., Vol. II, at 236 (Email from Ms. Seddon to LSH Pharmacy, June 10, 2020). She also wrote in the email that, in any event, PRFs would not take into account the number of prescription orders filled until July.

That morning, Ms. Iweha logged into the queue to check drug interactions on pending prescriptions and verify them. Meanwhile, Ms. Seddon called Ms. Finger, who passed the phone to Mr. Fox. Ms. Iweha overheard Mr. Fox telling Ms. Seddon that Ms. Iweha was "holding up the queue." Jt. App., Vol. III, at 180, Tr. 94:14–17. Ms. Iweha responded that she was checking for drug interactions. After the phone call with Ms. Seddon ended, Ms. Iweha reported that Mr. Fox started "coming towards" her and began "yelling" at her. *Id*. at 181, Tr. 95:1–6. In Ms. Iweha's telling, he pointed his finger at her, became red in the face, and said, "If you want war, I'll give you war." *Id*. at 180–81, Tr. 94:22–95:10.

Mr. Fox and Ms. Finger recall the event differently; both paint Ms. Iweha as

the instigator and maintain that Mr. Fox did not act aggressively toward Ms. Iweha.[1]

Mr. Fox does admit that he told Ms. Iweha "If you want war, I'll [sic] can give you

war." Jt. App., Vol. II, at 284 (Rep. of Jason Yeakley, dated Aug. 31, 2020).

**4**

Two pharmacy technicians, Kelly Lopez and Lynette Lewis, witnessed the

confrontation between Ms. Iweha and Mr. Fox on June 10 and reported it to Ms.

Prescott shortly thereafter. They informed Ms. Prescott that "Ms. Iweha was

shouting at Mr. Fox, while Mr. Fox was standing there trying to talk calmly to her."

*Id.* ¶ 11, at 64. Ms. Prescott opened an investigation into Ms. Iweha later that day.

As part of the investigation, Ms. Prescott interviewed Ms. Iweha. This

interview took place on the same day as the confrontation between Mr. Iweha and

Mr. Fox—that is, on the first day of the investigation, June 10. During this

interview, Ms. Iweha "never complained about suffering discrimination or

harassment on the basis of her race or national origin" but rather complained "that

she felt excluded and that there was no plan for coverage when Ms. Seddon was out

---

[1] Consistent with our standard of review on summary judgment, we mention all relevant witness accounts of the incident, but we view the corpus of the evidence in the light most favorable to Ms. Iweha. In this regard, we recognize that our standard requires us to "review 'the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party'" without "weigh[ing] the evidence[,] mak[ing] credibility determinations," or "determin[ing] the truth of the matter" with regard to "conflicting testimony." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023) (first quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012); then quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); and then quoting *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1217 (10th Cir. 2022)).

of the office." *Id.* ¶ 15, at 64. Ms. Prescott asked Ms. Iweha about the incident with Mr. Fox that morning and about her use for personal purposes of office resources and her phone during the workday. Ms. Iweha provided an account of the morning confrontation, and she denied that she used office resources for personal purposes or made extensive personal calls during the day. Immediately after her interview, LSH placed Ms. Iweha on administrative leave.

Ms. Prescott continued with her investigation through July 20, 2020. She interviewed Ms. Seddon, Mr. Fox, Ms. Finger, and a number of pharmacy technicians. Ms. Iweha's coworkers and supervisor reported that she: regularly committed "Time Abuse" by arriving late, leaving for parts of the work day, and leaving early; was "[v]erbally abusive to co-workers"; was "[p]hysically demonstrative in an aggressive manner with coworkers"; "[c]herry pick[ed] her duties"; "[r]efuse[d] to do some duties"; was "uncommunicative"; "[did] her school work/studying/special projects for class credit during work hours"; would "not complete special projects for drug projects when asked by [her] supervisor"; "[c]lick[ed] on orders (which locks them) then [took] long periods of time to complete" them (thereby preventing anyone from working on them); "[r]efuse[d] to answer the phone"; "[m]ore than once [was] caught sleeping in the break area"; "[s]urf[ed] the internet excessively"; "[r]ead[] a book (South Beach Diet) with a cover over it so no one [would] know [during] much of the day"; "[took] personal phone calls on a regular basis for long periods of time from her daughter and husband (up to 1.5 hours)"; and "[p]rint[ed] text books for schooling on color printer (entire

10

books)." *Id*. at 68–70.

Ms. Prescott also examined pharmacy records to independently validate Ms. Iweha's co-workers' accounts of her performance during the workday. She viewed a limited record of Ms. Iweha's phone calls, a record of Ms. Iweha's internet browsing on her LSH computer, and a key card record showing when Ms. Iweha entered and exited the pharmacy. In Ms. Prescott's view, these records demonstrated that Ms. Iweha was indeed "using her computer [to do] a lot of school work during work hours," as well as "surfing on the internet and online shopping." Jt. App., Vol. VI, at 80, Tr. 58:4–7 (Prescott Dep., Sept. 27, 2022). Ms. Prescott "found the reports of Ms. Iweha's coworkers credible and had no reason to disbelieve their reports of workplace misconduct by Ms. Iweha." Jt. App., Vol. II, ¶ 22, at 65. She therefore recommended that Ms. Iweha be terminated.

**5**

On July 24, 2020, LSH Superintendent Lesia Dipman sent Ms. Iweha a letter notifying her that the hospital "proposed" dismissing her from her employment with KDADS, effective August 3, 2020. Jt. App., Vol. VI, at 188 (Letter from Ms. Dipman to Ms. Iweha, dated July 24, 2020). The letter informed Ms. Iweha that an investigation had found she had violated the following policies: KDADS State Hospital Employee Policy Manual No. 3.8, Employee Conduct; KDADS State Hospital Employee Policy Manual No. 4.8, Use of Computer Equipment, Fax Machines and Telephones; KDADS State Hospital Employee Policy Manual No. 3.8, Employee Conduct, K. Sleeping on duty; and Larned State Hospital Administrative

Policy AD – 23.0 Use of LSH Intranet.  The letter informed Ms. Iweha that "[b]efore a final decision is made on your proposed dismissal, you are afforded the opportunity to reply in writing, or appear before [Superintendent Dipman] in person, or both.  During your opportunity to appear, you may present reasons or explanations as to why the proposed discipline should not take place." *Id*. at 189.

On July 27, 2020, Ms. Iweha's counsel provided a written response to Superintendent Dipman.  In the letter, Ms. Iweha's counsel characterized the proposed termination as "a premeditated attempt to unjustly remove [Ms. Iweha] from employment in a most brazen manner without the benefit of due process or just cause."  Jt. App., Vol. II, at 261 (Letter from Anthony Ezeogu to Lesia Dipman, dated July 27, 2020).  As context, Ms. Iweha's counsel called attention to the ongoing national efforts aimed at "eliminating or mitigating systemic racism," and cautioned that Ms. Iweha's proposed termination "perpetuates that stereotype," although the letter did not specify what stereotype it referenced.  *Id*.

The letter also attempted to refute the factual allegations made in Superintendent Dipman's letter.  In its conclusion, the letter noted that "Ms. Iweha is aware that Larned State Hospital is an equal opportunity organization and does not condone or encourage any form of harassment, discrimination or unfair treatment of its employees based on race, faith, color or creed" and that her counsel believed the allegations against her did not warrant "the extreme action taken against her in light of [LSH's] failure to act on similar and more egregious conduct by other co-workers known to management, and who are similarly situated like Ms. Iweha." *Id*. at 270.

Counsel's letter also "respectfully put[] management on notice to handle this matter in a non-discriminatory manner and ensure any decision taken follow[s] due process and [is a] thorough investigation with strict proof." *Id.* at 271.

The hospital did not conduct any further investigation; it terminated Ms. Iweha's employment on August 3, 2020.

**B**

Ms. Iweha filed this lawsuit on September 20, 2021. She brought four claims: (1) a Title VII hostile work environment claim against the State of Kansas and KDADS, (2) a Title VII disparate treatment discrimination claim against the State of Kansas and KDADS, (3) a Title VII retaliation claim against the State of Kansas (and, as reflected in the Pretrial Order, KDADS), and (4) a 42 U.S.C. § 1981 race- and national origin-based discrimination claim against Mr. Fox, Ms. Seddon, and Superintendent Dipman. On December 2, 2021, Defendants moved to dismiss Ms. Iweha's Title VII hostile work environment claim and her § 1981 race- and national origin-based discrimination claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court denied the motion with respect to the Title VII hostile work environment claim but granted it in part with respect to Ms. Iweha's § 1981 discrimination claims against Mr. Fox and Superintendent Dipman. Following discovery, Defendants moved for summary judgment on the remaining claims.

The district court granted Defendants' summary judgment motion in full. The court first addressed Ms. Iweha's hostile work environment claim. It assessed that Ms.

Iweha indisputably satisfied three of the four required elements for a hostile work environment claim; only the fourth element—"whether plaintiff has adduced evidence permitting a jury to find 'pervasive and severe' harassment"—was in dispute. Jt. App., Vol. VII, at 36 (Mem. & Order, Apr. 7, 2023). The court determined that "[t]he handful of 'isolated incidents of racial enmity or sporadic slurs,' that occurred over about a two-year period, don't come close to a showing of 'a steady barrage of opprobrious racial comments,'" and there was not a "sufficiently severe episode" under our precedent "to present a triable Title VII hostile work environment claim." *Id*. at 43 (first quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005); and then quoting *Brown v. LaFerry's LP Gas Co.,* 708 F. App'x 518, 521 (10th Cir. 2017)).

Next, the district court evaluated Ms. Iweha's Title VII disparate treatment claim stemming from her allegedly unlawful discharge. It applied the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and "assume[d], without deciding, that [Ms. Iweha] could establish her prima facie case of discrimination." *Id*. at 47–48. It also concluded that Defendants "established a legitimate, non-discriminatory reason for terminating [Ms. Iweha's] employment," so it assessed the viability of the claim by examining whether Ms. Iweha had shown "a triable issue of pretext" for her termination. *Id*. at 48.

The court rejected each of Ms. Iweha's three pretext theories. First, it determined that Defendants had not failed to follow their progressive discipline policy because progressive discipline was discretionary, and their policy permitted termination for the first offense. Second, it determined that Ms. Iweha had failed "to demonstrate any

14

evidence that Ms. Prescott didn't honestly believe the conclusion of her investigation," *id*. at 53, and that the evidence did not support Ms. Iweha's argument that Ms. Prescott uncritically relied on a biased subordinate's version of events. Third, it found that Ms. Iweha had failed to prove that she "was treated differently from similarly-situated employees," because none of the comparators she identified were, in fact, similarly situated. *Id*. at 55 (quoting *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011)).

The district court moved on to address Ms. Iweha's Title VII retaliation claim. Again, the court applied the *McDonnell Douglas* burden-shifting framework. The court found that Ms. Iweha's claim failed at the first stage: she did not establish a prima facie case of retaliation. Ms. Iweha's argument was based on three events that she alleged were protected conduct. The court determined that the first event—complaining to Ms. Seddon—did not qualify as protected activity because Ms. Iweha did not make specific complaints about discrimination by her employer. The court found that Ms. Iweha had waived her argument based on the second event that she claimed was protected conduct—that is, displaying Governor Kelly's letter—because she had not alleged that posting the letter was protected conduct in the Pretrial Order. The court went on to decide that "even if [Ms. Iweha] hadn't waived this theory of protected opposition, it would fail," *id*. at 66, because it, too, was not a specific complaint about an illegal employment practice by her employer.

Finally, the district court "assume[d] without deciding" that Ms. Iweha's attorney's July 27, 2020, letter constituted protected activity, and it determined that (a)

15

Ms. Iweha had "abandoned" her theory that she was retaliatorily terminated due to the

attorney's letter because she did not respond to Defendants' argument that she had failed

to show causation, and (b) even if Ms. Iweha had not abandoned it, the theory was

unconvincing because Ms. Iweha did not "show a causal connection between her

attorney's letter refuting the results of their investigation and [Ms. Iweha's] termination."

*Id*. at 67–68.[2]

Ms. Iweha timely filed this appeal.

## II

"We review the district court's summary judgment decision de novo, applying the

same standards as the district court." *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023)

(quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017)). "Summary

judgment is proper if, viewing the evidence in the light most favorable to the non-moving

party, there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Id*. (quoting *Peterson v. Martinez*, 707 F.3d 1197, 1207

(10th Cir. 2013)). We "review 'the evidence and draw reasonable inferences therefrom

in the light most favorable to the nonmoving party.'" *Forth v. Laramie Cnty. Sch. Dist.*

---

[2] The district court also addressed Ms. Iweha's § 1981 race- and national origin-based discrimination claim against Ms. Seddon. The court determined that Ms. Seddon was entitled to qualified immunity because Ms. Iweha had "fail[ed] to present a triable issue whether defendant Seddon 'violated a statutory or constitutional right.'" Jt. App., Vol. VII, at 70 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The court found that Ms. Seddon's conduct—"mak[ing] a couple of inappropriate comments" and failing to "discipline [Ms. Iweha's] coworkers for doing the same"—did not violate any clearly established law. *Id*. Ms. Iweha does not challenge on appeal the district court's grant of summary judgment for Ms. Seddon on this basis. We therefore do not address this matter further.

*No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)).

## A

We first address Ms. Iweha's hostile work environment claim against the State of Kansas and KDADS.  We explain why the facts that Ms. Iweha has identified cannot establish discriminatory conduct that is either sufficiently pervasive or severe to create a hostile work environment.

## 1

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  "Under Title VII, a plaintiff can prove discrimination in several different ways, including proof of a hostile work environment or disparate treatment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).  "An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hall v. U.S. Dept. of Labor, Admin. Rev. Bd.*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)).  "Our precedent reveals no talismanic number of incidents needed to give rise to a hostile discrimination claim. . . .  [W]hether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008).

A plaintiff must prove that their work environment was both "objectively and subjectively hostile." *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quoting *Davis*, 142 F.3d at 1341). Notably, the district court's observation at summary judgment also holds true on appeal: "[n]either party appears to challenge whether [Ms. Iweha] subjectively found her work environment hostile." J. App., Vol. VII, at 37. Therefore, the focus here is on whether Ms. Iweha has established the objective aspect of her hostile work environment claim. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

"Proof of either severity *or* pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Throupe*, 988 F.3d at 1252 (emphasis added). "[A] sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Tademy*, 614 F.3d at 1144 (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)). Even as to the latter scenario of a pattern of harassment, "there is a qualitative dimension to the pervasiveness inquiry (as well as the one for severity); logically, as relevant here, the workplace environment is likely to become more readily permeated by race-based [or nation origin-based] ridicule, insult, and the like, insofar as the repeated harassing acts approach the level of severe." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1223 (10th Cir. 2015). When asked at oral argument whether Ms. Iweha was

18

using a theory of pervasiveness or severity, Ms. Iweha's counsel responded "both," and then "either/or." Oral Arg. Tr. 8:06–8:16. Accordingly, we examine whether Ms. Iweha has identified sufficient discriminatory conduct under either theory.

In doing so, we recognize the relevance of certain facially neutral incidents to our analysis. "[F]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct." *Lounds*, 812 F.3d at 1224 (second and third alterations in original) (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012)). This same principle logically applies in the context of a hostile work environment claim based on alleged national origin discrimination. Thus, abusive conduct that is facially neutral is ordinarily considered in our evaluation of the "totality of the circumstances," and that totality is ordinarily "the touchstone" of any hostile work environment analysis. *Lounds*, 812 F.3d at 1222 (quoting *Hernandez*, 684 F.3d at 959).

**2**

On appeal, Ms. Iweha accuses the district court of disregarding that touchstone: the "totality of the circumstances" test. Aplt.'s Opening Br. at 50–51. We owe no deference to the district court's legal reasoning under our de novo review. Nevertheless, we conclude that Ms. Iweha fundamentally misunderstands the district court's analysis; that analysis fully engages with the totality of the circumstances.

Ms. Iweha's misunderstanding appears to derive from the district court's careful examination of each incident she identifies. *See* Aplt.'s Opening Br. at 53–54. Indeed,

the district court engaged with each specific incident that Ms. Iweha alleged, as do we *infra*. However, incident-specific analysis does not violate a court's obligation to examine the totality of the circumstances in a hostile work environment claim. To the contrary, incident-specific analysis is typically necessary for a proper totality of the circumstances assessment. First, because even a singular incident may be sufficiently severe to create a hostile work environment, courts must consider each incident to assess whether, standing alone, it is sufficiently severe to create a hostile work environment. *See, e.g.*, *Morris*, 666 F.3d at 665. Second, with regard to a pervasiveness theory of hostile work environment, courts must also consider the nature of each incident alleged in order to understand the environment of which the incidents are a part. As we aptly noted in *Lounds*, "[m]uch like '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance,' . . . 'a discrimination analysis must concentrate not on individual incidents, but on the overall scenario,' which is informed by *the sum total of those incidents*." *Lounds*, 812 F.3d at 1223–24 (emphasis added) (quoting *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998)). Yet Ms. Iweha appears to believe that a court should skip the individual scenes altogether and read no further than the playbill summary. Not so. Without understanding each and every scene, it is impossible to understand the nature of the play. Stated otherwise, only when a court understands the actors' conduct in the individual scenes is it equipped to determine whether that conduct has transformed the work environment into a hostile one.

**3**

Ms. Iweha also takes issue with the district court's analysis of her hostile work

environment claim on the basis that, in her view, the district court only focused on possible racial discrimination and ignored national origin discrimination. *See* Aplt.'s Opening Br. at 43. Although the district court's analysis does not control our de novo evaluation of its summary judgment ruling, we disagree with Ms. Iweha.

The district court's Memorandum and Order plainly contradicts Ms. Iweha's assessment. To give a few examples, in describing Ms. Iweha's hostile work environment claim, the district court noted at the outset that "Plaintiff argues that other pharmacists at LSH subjected her to continuous derogatory comments and singled her out as the only Black *and Nigerian* person in the pharmacy—amounting to a hostile work environment." J. App., Vol. VII, 35–36 (emphasis added). In explaining the plaintiff's burden at summary judgment, the court explained that there must be evidence "that the victim 'was targeted for harassment because of [her] . . . race[] *or national origin*." *Id*. at 37–38 (alterations and omission in original) (emphasis added). Finally, the district court explicitly considered Ms. Iweha's coworkers' comments and questions about Nigeria in its evaluation of her hostile work environment claim. In short, Ms. Iweha's contention that the district court elided the national origin dimension of her hostile work environment claim is belied by even a cursory examination of the district court's Memorandum and Order.

**4**

Turning to the heart of the matter, although Ms. Iweha has pointed to several troubling interactions at her workplace, she cannot satisfy the high bar required for a hostile work environment claim—on either the issue of severity or pervasiveness.

21

Although it is true that there is "no talismanic number of incidents needed to give rise to a hostile discrimination claim," *Tademy*, 614 F.3d at 1143, a plaintiff ordinarily "must show more than a few isolated incidents of . . . enmity" on the basis of the protected status to establish a hostile work environment, *Lounds*, 812 F.3d at 1223 (quoting *Witt v. Roadway Exp.*, 136 F.3d 1424, 1432 (10th Cir. 1998)). Even "sporadic . . . slurs" are insufficient; there must be a "steady barrage of opprobrious . . . comments" based on race or national origin. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). Yet Ms. Iweha has not identified any explicit discriminatory slurs—much less a quantity of them that would be deemed more than sporadic or isolated—nor has she pointed to anything approaching a barrage of critical or offensive comments. Both as to severity and pervasiveness, her hostile work environment claim comes up far short.

More specifically, the incidents Ms. Iweha believes evince a hostile work environment include: her initial exclusion from the projects with the University of Kansas consultant; Mr. Fox's questions about whether Nigeria had pharmacy schools, a currency, or cars; Ms. Seddon's question about where Ms. Iweha learned to speak English; Ms. Finger's question about whether Ms. Iweha ever washed her hair; Ms. Seddon's disparaging comment about the Martin Luther King, Jr. holiday; Mr. Fox's one-time request that a pharmacy technician, rather than Ms. Iweha, watch the queue when he left the office; Ms. Seddon's comment that "Nigerian women do not go to school. The few who do get educated are bossy"; and the "slave trade beads" event. Although these incidents are troubling, we cannot conclude that any of them—viewed in isolation or in the aggregate—rise to the level of creating a hostile work environment.

22

"Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Hernandez*, 684 F.3d at 957 (quoting *Morris*, 666 F.3d at 663–64). Our caselaw demonstrates the type of outrageous conduct that may render a work environment hostile—that is, conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hall*, 476 F.3d at 851 (quoting *Davis.*, 142 F.3d at 1341). For example, in *Lounds*, we concluded that "a rational jury could find that [the African-American plaintiff's] workplace was permeated with discriminatory conduct that was sufficiently pervasive to alter the terms and conditions of her employment." 812 F.3d at 1232. There, one co-worker repeatedly used the word "nigga," another co-worker stated, "[w]e need to bring back lynching," and a supervisor "directed the employees to address [a visiting executive] by saying, 'YES MASSA.'" *Id.* at 1213–14.

In a like vein, in *Tademy*, we concluded that the African-American plaintiff's allegations were sufficient to allege "severe rather than pervasive harassment" to support a hostile work environment claim. 614 F.3d at 1144. There, to mention only a few of the highly offensive workplace incidents, the plaintiff found "the words 'nigger' and 'nigger go home,' etched on [his] locker," *id.* at 1145, observed "two racist cartoons posted on company billboards," *id.* at 1136, and—in an event that left the plaintiff "physically ill," *id.* at 1145, saw "what appeared to be a life-size hangman's noose prominently suspended from a large industrial wall clock," *id.* at 1137.

23

Furthermore, in *Hernandez*, we similarly "conclude[d] that a rational jury could find that [the plaintiff's] workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter her conditions of employment." 684 F.3d at 958. The plaintiff—"a Latina of Mexican origin"—"presented evidence of at least a dozen racially offensive comments and jokes over the fourteen months" that she worked under her discriminatory supervisor. *Id.* at 953, 958. These comments included *repeated* offensive "jokes," such as "[D]o you know why Mexicans and Latinos make tamales for Christmas? So they can have something to unwrap," and *repeated* accusations that a wanted murderer seen on the news was the plaintiff's son or brother because they shared the last name "Hernandez." *Id.* at 954.

Ms. Iweha points to no such workplace conduct. It simply cannot be reasonably gainsaid that Ms. Iweha's workplace environment does not even come close to resembling the workplace environments of the plaintiffs in *Lounds*, *Tademy*, and *Hernandez*—measured either in terms of the severity or pervasiveness of the objectionable conduct. Though this lack of comparability may not be determinative in itself, it is highly instructive concerning the fatal weaknesses of Ms. Iweha's hostile work environment claim. Ms. Iweha has not shown that she was subjected to any slurs based on her race or national origin nor to anything approaching a barrage of opprobrious comments. At most, she was asked a handful of insensitive questions and experienced two offensive incidents that touched on her race and national origin—i.e., Ms. Seddon's remark about Nigerian women and Mr. Fox's display of the "slave trade beads." That is simply not enough.

24

A case that Ms. Iweha herself relies on, *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917 (10th Cir. 2001), further establishes why she has not demonstrated a hostile work environment. In *McCowan*, the hostile work environment was saturated with explicit racial slurs, including "nigger" and "spik," and the plaintiffs were called "cholo-attitude motherfuckers" and "burrito-eating motherfuckers" consistently over their short, three-week tenure. 273 F.3d at 923. Although the absence of slurs is not dispositive to a hostile work environment claim, *McCowan* demonstrates the extremely high bar that a plaintiff typically must surpass in order to successfully make a claim that their work environment was not just uncomfortable at times, but overtly hostile in an unlawful way. Ms. Iweha's workplace is patently incomparable to the intolerable work environment in *McCowan*.

Ms. Iweha's case more closely resembles that of the plaintiff in *Chavez v. New Mexico*, 397 F.3d 826 (10th Cir. 2005). In *Chavez* we explained that "two racially offensive remarks . . . fall far short of the 'steady barrage' required for a hostile environment claim." *Chavez*, 397 F.3d at 832. We noted that one of those comments involved the explicit use of a racial slur, but we nonetheless held that "a few isolated incidents" did not transform the plaintiff's workplace into a hostile work environment. *See id.* (quoting *Bolden*, 43 F.3d at 551). Ms. Iweha's claim fares no better. She points to a handful of comments over the course of multiple years. Though these comments could be fairly characterized as insensitive, or even offensive, she has not shown anything resembling a "steady barrage of opprobrious . . . comments" based on her race or national origin. *Bolden*, 43 F.3d at 551. Like the plaintiff in *Chavez*, Ms. Iweha's

25

evidentiary showing is insufficient.

* * *

In sum, Ms. Iweha has not established a genuine dispute as to any material fact regarding her race-based and national origin-based Title VII hostile work environment claim—either on the issue of severity or pervasiveness.  Defendants are entitled to summary judgment on this claim.

**B**

We next evaluate Ms. Iweha's Title VII disparate treatment claim.  Here, too, we conclude that Ms. Iweha has not made out a sufficient claim to survive summary judgment.

**1**

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci*, 557 U.S. at 577.  As relevant here, Title VII's prohibition includes intentional discrimination, which is "known as 'disparate treatment.'" *Id.*

"To prove a claim for discrimination, [a plaintiff] may rely on either direct evidence of discrimination or use the three-step burden-shifting framework" that the Supreme Court established in its seminal case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022).  Under this framework, "[f]irst, the plaintiff must prove a prima facie case of discrimination." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  Second, "[i]f the plaintiff satisfies the prima facie requirements, the defendant bears the

burden of producing a legitimate, nondiscriminatory reason for its action." *Id.* Third, "[i]f the defendant does so, the plaintiff must either show that his race [or national origin] was a determinative factor in the defendant's employment decision, or show that the defendant's explanation for its action was merely pretext." *Id*.

Neither Ms. Iweha nor Defendants contend that Ms. Iweha is using direct evidence of discrimination, so the *McDonnell Douglas* burden-shifting framework is applicable. Under the *McDonnell Douglas* framework, Ms. Iweha does not contest the legitimacy of KDADS's reasons for terminating her, and, on appeal, the parties appear to center their arguments on the framework's third step: that is, the question of pretext—and, more specifically, whether KDADS's explanation for terminating Ms. Iweha's employment was merely pretextual. The parties' approach is consistent with the district court's decisional path: the district court assumed without deciding that Ms. Iweha could make out a prima facie claim of discrimination and ultimately ruled against her because she failed to make a sufficient showing of pretext. Like the parties and the district court, we focus on the pretext question. We conclude, as the district court did, that Ms. Iweha cannot satisfy part three of the *McDonnell Douglas* framework: *viz.*, she has failed to demonstrate that the reasons KDADS offered for terminating her employment were pretextual. Accordingly, Ms. Iweha cannot prevail on her Title VII disparate treatment claim.

When evaluating a potential pretext argument, "we must not sit as a superpersonnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight." *Frappied v. Affinity Gaming Black Hawk, LLC*,

27

966 F.3d 1038, 1059 (10th Cir. 2020) (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813–14 (10th Cir. 2000)).  Accordingly, "we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007).  "We do not ask whether the employer's reasons were wise, fair or correct." *Id.* at 1118.  We simply determine "whether the employer honestly believed its [legitimate, nondiscriminatory] reasons and acted in good faith upon them." *Id.* at 1119.

Although

> "[t]he evidence which [a plaintiff] can present in an attempt to establish that [a defendant's] stated reasons are pretextual may take a variety of forms[,]" . . . [a] plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; . . . (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (first three alterations in original) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, 105 Stat. 107, *as recognized in CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449 (2008)).

**2**

Ms. Iweha maintains that Defendants' use of pretext is evident from their failure to follow a progressive approach to discipline as mandated by their own written policy.  As

the district court correctly recognized, this argument is untenable given the policy's

specific statement that progressive discipline is optional.

"[W]here 'progressive discipline [is] entirely discretionary,' and the employer 'did

not ignore any established company policy in its choice of sanction, the failure to

implement progressive discipline is not evidence of pretext.'" *Lobato v. N.M. Env't*

*Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (second alteration in original) (quoting

*Timmerman v. U.S. Bank*, 483 F.3d 1106, 1120 (10th Cir. 2007)).

Here, KDADS's policy unambiguously granted Superintendent Dipman this kind

of discretion.  Section No. 3.6 of the KDADS State Hospital Employee Manual explicitly

provides that "[d]epending on the nature/severity of an incident[,] progressive discipline

stages may be skipped or repeated as deemed appropriate by the Appointing Authority."

Jt. App., Vol. VI, at 187 (KDADS State Hosp. Emp. Pol'y Manual No. 3.6 Disciplinary

Action).  The policy also states that "dismissal" is one of the stages of progressive

discipline available to the Appointing Authority.  *Id*.

What's more, each of the specific policy provisions that Ms. Iweha was accused

by her employer of violating also warned that the possible consequences for failing to

abide by the provision included dismissal.  No. 3.8 stated "[s]uch behavior may result in

formal disciplinary action, including dismissal," Jt. App., Vol. II, at 252 (KDADS State

Hosp. Emp. Pol'y Manual No. 3.8 Employee Conduct), No. 3.8K provided "[s]leeping on

duty by any KDADS employee is unacceptable personal conduct calling for prompt

disciplinary action up to and including dismissal," *id*. at 253 (KDADS State Hosp. Emp.

Pol'y Manual No. 3.8K Sleeping on Duty), and No. 4.8 explained "[v]iolation of this

29

policy may result in the proposal of disciplinary action up to and including termination of employment," *id*. at 255–56 (KDADS State Hosp. Emp. Pol'y Manual No. 4.8 Use of Computer Equipment, Fax Machines and Telephones).

In sum, the evidence presented shows that Ms. Iweha's employer did not act contrary to written policy in terminating her employment. The policies provided that progressive discipline was discretionary and termination was a permissible outcome for a violation of any one of the three policies that Ms. Iweha was charged with violating. In exercising discretion and terminating Ms. Iweha, her employer acted consistently with its policy—not contrary to it. Therefore, this theory of pretext fails.

**3**

Ms. Iweha's second pretext theory in the district court, and her primary theory on appeal, is that Ms. Prescott's investigation was illegitimate, a "sham." Aplt.'s Opening Br. at 54; *see also* Oral Arg. Tr. 13:19. It is undisputed that Superintendent Dipman was the final decisionmaker who terminated Ms. Iweha's employment. And Ms. Iweha does not allege that Superintendent Dipman herself possessed any kind of discriminatory bias or animus toward her. Oral Arg. Tr. 14:21–37. Accordingly, Ms. Iweha's focus on the alleged irregularity of Ms. Prescott's investigation only makes sense insofar as Ms. Iweha seeks to invoke the so-called "cat's paw" theory. Under that theory, Superintendent Dipman's termination decision was the product of her uncritical reliance on Ms. Prescott's irregular investigation—an investigation that was supposedly tainted by discriminatorily biased allegations of Ms. Iweha's coworkers. If there were sufficient proof to that effect, Superintendent Dipman's termination decision would be actionable—

30

even though she did not personally harbor discriminatory animus against Ms. Iweha. However, as we explain, Ms. Iweha does not muster sufficient proof to support her cat's paw theory.

The "cat's paw" theory of liability "allows a plaintiff to establish pretext even without evidence that the actual decisionmaker possessed an unlawful motive." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019) (citation and internal quotation marks omitted). Under this theory, an employer is liable for engaging in a discriminatory, adverse employment action "if a subordinate to the decisionmaker 'performs an act motivated by [discriminatory] animus that is *intended* by the [subordinate] to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action.'" *Id.* (quoting *Staub v. Proctor*, 562 U.S. 411, 422 (2011)). Under this framework, the decisionmaker "has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Lobato*, 733 F.3d at 1294 (quoting *Staub*, 562 U.S. at 417). Essentially, "'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006).

The key element of a successful cat's paw theory of pretext is an unbroken causal chain connecting the biased employee's action to the unbiased decisionmaker's adverse decision. *See Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1339 (10th Cir. 2022) ("[W]e'd need to decide whether [the employer's] procedures had broken the causal

31

chain between the supervisor's retaliatory motive and the firing."). When the biased employee, motivated by unlawful discriminatory intent, feeds information to the unbiased decisionmaker with the intention of effecting an adverse employment action, we inquire whether that decisionmaker placed "uncritical reliance" on that information. *See Singh*, 936 F.3d at 1038 (quoting *Lobato*, 733 F.3d at 1294). "[A] 'necessary' element to a [cat's paw] claim is the decisionmaker's uncritical 'reli[ance]' on facts provided by a biased" employee. *Lobato*, 733 F.3d at 1294 (third alteration in original) (quoting *Staub*, 562 U.S. at 421); *see also Singh*, 936 F.3d at 1038 ("If a final decisionmaker fires an employee based on 'uncritical reliance' on facts provided by a biased subordinate, the subordinate's bias is the proximate cause of the employment action." (quoting *Lobato*, 733 F.3d at 1294)).

A cat's paw theory can be defeated by showing a break in the causal chain, or a lack of uncritical reliance by the unbiased decisionmaker. The most common way to make this showing is by establishing that the employer "conduct[ed] an independent investigation of the allegations against an employee" to verify the biased employee's claims. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 488. In such a circumstance, the "causal link is defeated," *id.*, because the employer has taken steps to form an independent judgment regarding the propriety of the adverse employment action. *See also Singh*, 936 F.3d at 1038 ("One way an employer can 'break the causal chain' between the subordinate's biased behavior and the adverse employment action is for another person or committee higher up in the decision-making process to independently investigate the grounds for dismissal."); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510,

32

516 (10th Cir. 2015) ("It is well-established in this Circuit that an employer can 'break the causal chain' between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee." (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1253 (10th Cir. 2006))); *Lobato*, 733 F.3d at 1294 ("[I]f the employer independently verifies the facts and does not rely on the biased source—then there is no [cat's paw] liability.").

"[I]nterpret[ing] our cases in a manner that permits them to coexist harmoniously," *United States v. Mier-Garces*, 967 F.3d 1003, 1018 (10th Cir. 2020) (quoting *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019)), it seems clear to us that, in past cases, we have effectively treated the question of whether the plaintiff was afforded an opportunity to explain her side of the story to the unbiased decisionmaker to be a proxy for a related, but more apposite, inquiry into whether the decisionmaker uncritically relied upon the biased employees' allegations. *See, e.g.*, *BCI Coca-Cola Bottling Co.*, 450 F.3d at 488 ("Indeed, under our precedent, simply asking an employee for his version of events may defeat the inference that an employment decision was racially discriminatory."); *Thomas*, 803 F.3d at 516–17 ("[W]e have held that simply asking an employee for his or her version of events may defeat the inference that an employment decision was discriminatory . . . ."); *cf. Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (noting that because the investigator did not "give Mr. Smothers a chance to explain or deny those allegations," "[t]he decision makers ultimately relied on one-sided information"). However, against the backdrop of the Supreme Court's decision in *Staub*, 562 U.S. at 42, we helpfully clarified and refined the focus of our

precedent in *Parker*, stating that "[t]he inquiry involves the independence of the employer's investigation, not the employee's opportunity to respond." 49 F.4th at 1339. Accordingly, though an employer-decisionmaker may bolster its argument that it conducted an independent investigation—and thus did not uncritically rely on another's discriminatorily biased allegations—by affording the employee-plaintiff an opportunity to explain her side of the dispute, such an action does not conclusively resolve the independent-investigation inquiry in the employer-decisionmaker's favor.

Though Ms. Iweha appears to invoke the cat's paw theory, she does not clearly specify her understanding of Ms. Prescott's role under the cat's paw framework. Specifically, Ms. Iweha does not clearly indicate whether she believes that Ms. Prescott was herself biased. In this regard, on one hand, she writes in her opening brief that "[t]he timeline of events in this case establishes that Prescott was motivated to terminate Iweha long before the June 10, 2020 incident," Aplt.'s Opening Br. at 59, and that "Prescott did not just bungle an investigation or do a poor job. Prescott set out to find a basis to terminate Iweha, after being pushed to do so by Fox in the March 2020 meeting," *id*. at 57–58. These contentions could be read as suggesting that Ms. Iweha believes Ms. Prescott shared in Mr. Fox's allegedly discriminatory animus and worked with him to effect Ms. Iweha's termination. Under such a framing, Ms. Iweha would be effectively asserting that Ms. Prescott—personally motivated by discriminatory intent—launched an investigation and crafted a biased report recommending that Ms. Iweha be terminated, and that Superintendent Dipman uncritically relied on that report and recommendation.

On the other hand, Ms. Iweha does not explicitly contend that Ms. Prescott had

discriminatory animus.  In fact, the previously quoted language about Mr. Fox "push[ing]," *id*. at 58, Ms. Prescott to investigate Ms. Iweha could be read as suggesting that Ms. Prescott, like Superintendent Dipman, had no bias against Ms. Iweha—that, instead, she acted as an unwitting dupe of other biased employees such as Mr. Fox, Ms. Finger, or Ms. Seddon.  Under this theory, Ms. Iweha would be effectively asserting that, though Ms. Prescott lacked discriminatory intent herself, she uncritically relied on the discriminatorily biased allegations of other employees in preparing her investigative report and arriving at her termination recommendation.  As a consequence, Ms. Prescott's resulting report and termination recommendation were tainted by that discriminatory bias, and the report and recommendation formed the final link in the unbroken causal chain leading to Superintendent Dipman, who in turn, under this theory, uncritically relied on the report and recommendation in terminating Ms. Iweha.

At oral argument, Ms. Iweha intimated that she was advancing both of these variations of a cat's paw theory as alternates to one another.  Oral Arg. Tr. 13:20–14:05 ("[E]ither she had racial or national origin bias, or she was fully committed to not only rubber-stamping but justifying the race- and national origin-based employment action that the pharmacy wanted to take against Ms. Iweha.").  Thus, we evaluate whether Ms. Iweha has sufficiently supported either version of a cat's paw theory and conclude that she has not.

The ambiguity in Ms. Iweha's presentation is symptomatic of the scarcity of evidence supporting either version of her cat's paw theory.  First, she has identified no evidence that Ms. Prescott had racial or national origin bias against her, which is fatal to

35

her first version.  The evidence supports the view that Ms. Prescott received numerous complaints about Ms. Iweha's behavior, met with Ms. Iweha and her supervisor to clarify and better address those complaints, and then conducted an investigation when her coworkers' complaints escalated on June 10, 2020.  There is simply no indication that Ms. Prescott performed these duties animated by discriminatory bias against Ms. Iweha. Therefore, the first version of her cat's paw theory—that Ms. Prescott was the discriminatorily biased mastermind behind her termination by Superintendent Dipman— must fail.  Notably, even if Ms. Iweha had been successful in demonstrating that Ms. Prescott's investigative report and termination recommendation were motivated by her own discriminatory bias, Ms. Iweha would still need to prove that Superintendent Dipman uncritically relied on Ms. Prescott's bias-tainted report and recommendation in terminating her.  *See Singh*, 936 F.3d at 1038 ("If a final decisionmaker fires an employee based on 'uncritical reliance' on facts provided by a biased subordinate, the subordinate's bias is the proximate cause of the employment action." (quoting *Lobato*, 733 F.3d at 1294)).  But we need not reach this latter issue because Ms. Iweha dispositively stumbles at the outset, on her first version of her cat's paw theory, by failing to offer proof of Ms. Prescott's discriminatory bias.

We now examine Ms. Iweha's alternate version of the cat's paw theory: Ms. Iweha's contention that, in conducting her investigation and recommending Ms. Iweha's termination, Ms. Prescott—though personally free of discriminatory bias—uncritically relied on the discriminatorily biased allegations of Ms. Iweha's coworkers and, in turn, Superintendent Dipman uncritically relied on Ms. Prescott's investigative report and her

36

termination recommendation in terminating Ms. Iweha.  Under this alternate cat's paw theory, Ms. Iweha must show that *both* Ms. Prescott and Superintendent Dipman uncritically relied on the discriminatorily biased allegations of Ms. Iweha's coworkers. *Cf. Parker*, 49 F.4th at 1339 ("[W]e'd need to decide whether [the employer's] procedures had broken the causal chain between the supervisor's retaliatory motive and the firing.").  An independent assessment by *either* would break the link in the causal chain and defeat this version of Ms. Iweha's cat's paw theory.

Stated otherwise, in proving this alternate version, Ms. Iweha must show that, in conducting her investigation and in making her termination recommendation, Ms. Prescott uncritically relied on the coworkers' discriminatorily biased allegations—such that her report and termination recommendation were tainted by such bias.  Then, she must show that Superintendent Dipman uncritically relied on Ms. Prescott's tainted investigative report and termination recommendation in deciding to terminate Ms. Iweha's employment.  If Ms. Iweha cannot demonstrate uncritical reliance by *both* Ms. Prescott and Superintendent Dipman on her coworkers' discriminatorily biased allegations, she cannot show an unbroken causal chain from those allegations to Superintendent Dipman's termination decision—and her cat's paw theory must fail.  *See Parker*, 49 F.4th at 1345 (Holmes, J., concurring) (noting that uncritical reliance "at the final layer of review is an essential element of cat's paw liability that the plaintiff bears the burden to establish").

All that said, our inquiry may begin and end with Ms. Prescott's investigation and her related termination recommendation.  Ms. Iweha has not demonstrated that Ms.

37

Prescott's investigation lacked independence and uncritically relied on her coworkers' discriminatorily biased allegations. To be sure, Ms. Prescott did speak with the employees that Ms. Iweha argues exhibited racial and national origin bias: Mr. Fox, Ms. Seddon, and Ms. Finger. However, Ms. Prescott also spoke with numerous other coworkers and with Ms. Iweha, herself. And as to her discussion with Ms. Iweha, recall that—even though allowing an employee an opportunity to offer his or her side of the dispute is not determinative—it does support an argument that an employer's investigation is independent and not controlled by biased, discriminatory allegations of coworkers.

Moreover, Ms. Prescott went beyond interviews. She also examined three forms of empirical data: records of Ms. Iweha's phone calls, internet browsing on her LSH computer, and key card swipes into and out of the pharmacy. *See* Jt. App., Vol. VI, at 54, Tr. 32:3–19. Taken together, Ms. Prescott's interviews and documentary factchecking undercut any argument that her investigation and resulting termination recommendation lacked independence and uncritically relied on the discriminatorily biased allegations of Ms. Iweha's coworkers. We underscore that it is the independence of her investigation that is at issue here; it is not our role to judge whether Ms. Prescott's investigation was optimal—in its scope or components—or whether it arrived at the right conclusion. *See Riggs*, 497 F.3d at 1118–19 ("We do not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."). The evidence clearly shows that Ms. Prescott did not uncritically rely on discriminatorily biased information, and that is all that is required.

Her fact-based investigation therefore broke the causal chain and fatally undermines Ms. Iweha's alternate version of her cat's paw theory.

We have construed Ms. Iweha's arguments to essentially involve two versions of the cat's paw theory. Under both versions, Superintendent Dipman—who undisputedly did not harbor racial or national origin bias against Ms. Iweha—terminated Ms. Iweha because she uncritically relied on the discriminatorily biased allegations of Ms. Iweha's coworkers. However, we conclude that the causal chain that Ms. Iweha tries to establish—from her coworkers' discriminatorily biased allegations to Superintendent Dipman's termination decision—was dispositively broken under both versions of Ms. Iweha's cat's paw theory.

**4**

In a last-ditch effort to show pretext for her termination, Ms. Iweha attempts to revive in her reply brief an argument that she made before the district court: the contention that she was treated differently from similarly situated comparators. *See* Aplt.'s Reply Br. at 15.

As an initial matter, Ms. Iweha waived this argument by not raising it in her opening brief. *See Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quoting *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997))); *see also United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived. And, ordinarily, we will decline to reach the merits of waived

issues."). Stated otherwise, it is not enough that Ms. Iweha attempts to highlight this argument in her reply brief. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). In our discretion, we therefore may decline to reach the merits of this pretext theory. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

Nonetheless, even if we were to consider this theory—and even if we were to assume that the theory is relevant at all on the question of pretext, *see, e.g.*, *Kendrick*, 220 F.3d at 1230 (enumerating a non-exhaustive set of "ways" to show pretext)—it would fail on the merits. "One method by which a plaintiff can demonstrate an inference of discrimination is to show that the employer treated similarly situated employees more favorably." *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). However, Ms. Iweha has not made such a showing. She articulates this theory on appeal using slightly different examples from those she used before the district court. First, she makes a perfunctory argument about her "treatment . . . regarding work hours and job performance factors" as compared to Mr. Fox and Ms. Finger. Aplt.'s Reply Br. at 15. However, this argument is meritless. The record clearly shows that Ms. Iweha was given the same opportunity as her coworkers to work in the mornings; that her preference for later hours was singly accommodated by Ms. Seddon's instruction to Mr. Fox and Ms. Finger to leave overnight prescription orders for Ms. Iweha to fill; and that Ms. Iweha was evaluated using the same objective factors on the PRF (factors that Ms. Iweha herself

40

agreed were reasonable).

Ms. Iweha's second similarly-situated-comparator argument is that Mr. Fox was not disciplined for the same June 10, 2020, incident for which she was placed on leave. However, this argument is unavailing for two reasons. First, as the district court noted, two pharmacy technicians promptly reported Ms. Iweha's conduct on June 10 to Ms. Prescott, while neither Ms. Iweha nor anyone else reported Mr. Fox's conduct. As a result, Mr. Fox was not similarly situated to Ms. Iweha because no one had raised a concern about Mr. Fox's conduct. Second, Ms. Iweha's termination stemmed from multitudinous concerns that her coworkers expressed about her contributions and conduct in the workplace—which Ms. Prescott sought to verify through examination of work records. Mr. Fox's workplace performance received no such expressions of concern from coworkers. Therefore, he was not similarly situated in this regard to Ms. Iweha.

* * *

For these reasons, none of Ms. Iweha's theories of pretext are supported by sufficient evidence. Thus, her claim fails under step three of the *McDonnell Douglas* framework.

**C**

Finally, we assess Ms. Iweha's Title VII retaliation claim. At various points in this litigation, Ms. Iweha has advanced three theories of retaliation. We address each in turn.

**1**

Under Title VII, an employer may not retaliate against an employee because the

41

employee "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). As with a disparate treatment claim, a plaintiff may establish a retaliation claim using either direct evidence, which in this context means showing "that retaliatory animus played a 'motivating part' in the employment decision," or "rely[ing] on the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Fye v. Okla. Corp. Com'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion), *superseded in part by* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(20(B)); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999); *accord Lounds*, 812 F.3d at 1233. Ms. Iweha relies on the *McDonnell Douglas* framework in advancing her retaliation claim.

To establish a prima facie case of retaliation, a plaintiff must prove "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (quoting *Timmerman*, 483 F.3d at 1123–24); *accord Lounds*, 812 F.3d at 1233–34. The "protected activity" refers to the plaintiff's "protected opposition to discrimination" made illegal under Title VII. *Lounds*, 812 F.3d at 1233. "To satisfy [the causal connection] element, a 'plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.'" *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (second alteration in original) (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)).

Once a plaintiff has made a prima facie showing of retaliation, the defendant must "provide a legitimate and facially non-retaliatory reason for its decision to terminate" her. *Vaughn*, 537 F.3d at 1153. If the defendant provides such a reason, the plaintiff "bears the ultimate burden of demonstrating that [the defendant's] proffered reason is pretextual." *Id.* at 1150 (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006)).

**2**

Ms. Iweha has consistently argued that she was retaliated against for complaining to Ms. Seddon about the way she was treated in the pharmacy. Ms. Iweha struggles to establish her prima facie case on this theory because it is not clear that her complaints to Ms. Seddon are protected activity under Title VII.

An employee's "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]. General complaints about company management . . . will not suffice." *Hinds v. Spirit/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *see also Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916

43

(10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim.").[3]

Ms. Iweha could not recall the specific content of her complaints to Ms. Seddon. Nonetheless, Ms. Iweha contends that she "made it known that [she] was being discriminated against." Jt. App., Vol. III, at 154, Tr. 68:8–12.

Without more, it is difficult to determine whether Ms. Iweha's complaints were sufficiently detailed to put her employer on notice that she was opposing her employer's perceived Title VII discrimination based on race or national origin. We do not have evidence before us that Ms. Iweha connected any of her complaints to her race or national origin. In fact, Ms. Iweha essentially admitted that the email she sent to KDADS after her termination was the first time that she reported systematic racism or defamation of character at work to anybody with KDADS.

Regardless, we need not decide whether Ms. Iweha has sufficiently established that her complaints to Ms. Seddon were protected activity for purposes of a prima facie case of retaliation. We may assume without deciding that her complaints to Ms. Seddon constitute protected activity and that Ms. Iweha has set out a prima facie case

---

[3]    We rely on unpublished cases for their persuasive value only and do not treat them as binding precedent. *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

successfully.[4] *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

Having done so, we conclude that Ms. Iweha's retaliation theory still fails at step three of the *McDonnell Douglas* framework, the pretext question. For essentially the same reasons explained *supra* in Part II.B, Ms. Iweha has not shown that Ms. Prescott's investigative results, including her termination recommendation—*viz.*, the legitimate and facially non-discriminatory reason KDADS offered for terminating her employment—constituted a pretext for terminating her in retaliation for her protected activity. Consequently, even assuming that Ms. Iweha's complaints to Ms. Seddon constituted protected activity, Ms. Iweha has not offered sufficient proof that her employer's reasons for terminating her were a pretext that, in this context, masked its retaliation for that protected activity. As a result, Ms. Iweha's first retaliation theory is unpersuasive.

**3**

Ms. Iweha also suggested that she was retaliated against for posting Governor Kelly's letter at her work station. However, we conclude that she has waived this argument.

The district court's Pretrial Order reflects that Ms. Iweha alleged two instances of protected activity as possible bases for retaliation: her aforementioned complaints to Ms. Seddon and her counsel's July 27, 2020, letter, which is discussed *infra* at Part II.C.4.

---

[4]    We also assume without deciding that as part of a successful prima facie case, Ms. Iweha has demonstrated causation. As explained *supra* in Part II.C.1, this element would require that Ms. Iweha prove Superintendent Dipman, the person who took adverse employment action against Ms. Iweha, was aware of Ms. Iweha's complaints to Ms. Seddon.

Not until responding to Defendants' motion for summary judgment did Ms. Iweha first claim that posting Governor Kelly's letter was protected activity. The district court therefore found at summary judgment that Ms. Iweha had "waived this theory of protected opposition by failing to include it in the Pretrial Order," which "controls the course of litigation" and has a "binding effect" on a plaintiff's arguments. Jt. App., Vol. VII, at 65–66 (quoting *Sunderman v. Westar Energy, Inc.*, 520 F. Supp. 2d 1269, 1278 (D. Kan. 2007), *aff'd*, 307 F. App'x 224 (10th Cir. 2009)).

Ms. Iweha waived merits review of this retaliation theory on appeal by failing to challenge the district court's waiver determination in her opening brief. *See United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004) ("The failure to raise an issue in an opening brief waives that issue."). She perfunctorily notes that the district court "agree[d]" with Defendants that she had not preserved the argument, but she then engages with the district court's subsequent discussion about the merits of the argument and leaves the waiver determination unrefuted. Aplt.'s Opening Br. at 37. In other words, Ms. Iweha notes the district court's waiver determination, but that is not enough to preserve the issue on appeal. She must squarely present her disagreement with the district court's waiver determination in her brief. "The first task of an appellant is to explain to us why the district court's decision was wrong," *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015), and Ms. Iweha did not do that here.

Moreover, even though the effort to do so likely would not have helped her, *see, e.g.*, *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) ("In this

Circuit, we generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived."), in her reply brief, Ms. Iweha again failed to explain why the district court's waiver determination was incorrect—despite acknowledging Defendants' arguments that the district court's waiver determination should resolve the issue. *See* Aplt.'s Reply Br. at 5 ("Appellees focus a significant portion of their argument attempting to establish that Iweha's posting of . . . [the] letter . . . should be ignored in this case as either an abandoned and waived argument or as not a protected activity.").

Consequently, Ms. Iweha has waived any argument that her posting of Governor Kelly's letter constituted protected activity.[5] She therefore cannot establish a prima facie case for retaliation based on such a theory.

**4**

Finally, Ms. Iweha attempts to establish a prima facie case for her retaliation claim using her counsel's July 27, 2020, letter as alleged protected activity. As with her theory about posting Governor Kelly's letter, Ms. Iweha waived this theory on appeal. However, in an exercise of our discretion, we explain below that if we elected to overlook Ms. Iweha's waiver, *see, e.g.*, *Abernathy*, 713 F.3d at 552, Ms. Iweha's

---

[5]    We also note that, at oral argument, Ms. Iweha's counsel appeared to affirmatively waive this theory—although our waiver finding does not rely on counsel's statement. *See* Oral Arg. Tr. 6:11–27 ("Your honor, I'm relying on that letter, not as a specific protected activity for retaliation. I'm relying on that letter to show the hostile work environment and that the ultimate adverse employment decision was based upon Ms. Iweha's race and national origin.").

argument would not succeed on the merits because she has not proven causation, the third required element of a prima facie retaliation claim.

To establish a causal connection, a plaintiff "must present 'evidence of circumstances that justify an inference of retaliatory motive.'" *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). "To satisfy [the causal connection] element, a 'plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.'" *Montes*, 497 F.3d at 1176 (quoting *Rice*, 983 F.2d at 181). "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Ward*, 772 F.3d at 1203.

At the outset, Ms. Iweha's retaliation theory based upon her counsel's letter cannot succeed because Ms. Iweha has waived this theory on appeal. Her waiver concerns the causation element of her prima facie claim. We assume without deciding that her counsel's letter is protected activity. Unlike her posting of Governor Kelly's letter, her counsel's letter was included in the Pretrial Order before the district court. However, during the summary judgment briefing, Ms. Iweha did not respond to Defendants' merits causation argument that Ms. Iweha could not show that her counsel's letter caused Superintendent Dipman to terminate her. The district court specifically found in its Memorandum and Order granting summary judgment that Ms. Iweha had "abandoned this theory of recovery," Jt. App., Vol. VII, at 67, by not responding to Defendants' causation argument.

In her opening brief, Ms. Iweha does not even mention the court's abandonment

48

finding; rather, she simply remarks on the merits that the court ruled "against [her] because she cannot 'prove' the letter caused the termination." Aplt.'s Opening Br. at 38. For like reasons to those we explained *supra* in Part II.C.3, Ms. Iweha's failure to address the district court's abandonment finding constitutes a waiver of any argument opposing that finding. *See Abdenbi*, 361 F.3d at 1289; *Nixon*, 784 F.3d at 1366. As a consequence of this waiver at the procedural threshold, Ms. Iweha has surrendered any right to be heard on the merits regarding the causal effect, if any, of her counsel's letter. Moreover, under very similar procedural circumstances, we also have held that a "[non-movant's] failure to rebut the arguments raised by defendants in their motion for summary judgment is fatal to his attempt to raise and rebut such arguments on this appeal." *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).

In short, because Ms. Iweha has failed to preserve any merits retaliation argument that her counsel's letter was the cause of her termination, she cannot prevail on her retaliation theory based on the counsel's letter. And, even if we were to exercise our discretion and overlook Ms. Iweha's lack of preservation on this issue, we nevertheless would conclude that Ms. Iweha has not established causation—as the district court ruled in the alternative. Ms. Iweha's counsel sent the letter in response to Superintendent Dipman's July 24, 2020, letter informing her of her proposed dismissal, which would be effective August 3, 2020. Superintendent Dipman then finalized Ms. Iweha's termination on that day. As such, Ms. Iweha's termination on August 3 was not newly imposed after her counsel sent his letter; rather, it was the finalization of KDADS's previously conceived discipline plan, "the next step in the process already set in motion." *Nixon*,

49

784 F.3d at 1370.  Under Ms. Iweha's proposed theory, the only way KDADS could avoid a retaliation claim would have been to reverse course on its planned termination when it received oppositional material from her counsel.  However, "employers need not refrain from previously planned actions upon learning that an individual has engaged in protected activity."  *Id*.  Ultimately, KDADS's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Id*. (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)).

* * *

In sum, none of Ms. Iweha's three theories of retaliation survive summary judgment.  Even assuming that her complaints to Ms. Seddon constituted protected activity and that she could establish a prima facie case of retaliation on that theory, she fails to show pretext as required by step three of the *McDonnell Douglas* test.  Her retaliation theory based upon her posting of Governor Kelly's letter falters before we reach the merits of the pretext question, because she has waived any argument that her action was protected conduct.  Finally, her theory that relies upon her counsel's July 27, 2020, letter also was not preserved for our review.  And even if we were inclined to reach the merits of the retaliation question as to the letter, Ms. Iweha could not establish the causation element required to make out a prima facie case in step one of the *McDonnell Douglas* test.

**III**

For the foregoing reasons, we conclude that Ms. Iweha has not shown a genuine

50

dispute of material fact that would have precluded a grant of summary judgment to

Defendants.  Accordingly, we **AFFIRM** the district court's judgment.